[Cite as *State v. Murphy*, 2015-Ohio-5108.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO

      Plaintiff-Appellee

-vs-

KYLE C. MURPHY

      Defendant-Appellant

JUDGES:
Hon. W. William B. Hoffman, P.J.
Hon. John W. Wise, J.
Hon. Craig R. Baldwin, J.

Case No. 2015CA00024

O P I N I O N

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Stark County Court of Common Pleas, Case No. 2014CR0326 |
| JUDGMENT: | Affirmed, in part; and Vacated and Modified in part; and Remanded for Resentencing |
| DATE OF JUDGMENT ENTRY: | December 7, 2015 |
| APPEARANCES: | |

For Plaintiff-Appellee

JOHN D. FERRERO,
Prosecuting Attorney,
Stark County, Ohio

By: KATHLEEN O. TATARSKY
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

JAMES L. BURDON
137 South Main Street
Suite 201
Akron, Ohio 44308

Stark County, Case No. 2015CA00024                                                    2

*Hoffman, P.J.*

{¶1}   Defendant-appellant Kyle C. Murphy appeals his convictions in the Stark County Court of Common Pleas. Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   On February 11, 2014, Appellant resided with his girlfriend S.L. and her eleven-month old daughter in a trailer.  At approximately 12:00 A.M., S.L. put the child to sleep. At approximately 1:00 to 2:00 A.M., S.L. went to bed.  S.L. was awakened at 6:00 A.M. to the sound of the child crying. S.L. then entered the bathroom of the trailer and found Appellant holding the child upside down in the shower under running water. Appellant held the child with one leg in each hand under the water.  He told S.L. the child had diarrhea and he was washing her off.  The child was changed into new pajamas and a new diaper, calmed, and Appellant agreed to put her to bed.  S.L. also went back to bed.

{¶3}   S.L. again awoke at 12:00 P.M. to the sound of the child crying.  She then found Appellant in the hallway of the trailer with the child in his arms. S.L. noticed the child had different pajamas on, and her face looked as if it had been burned.  Her eyes were bloodshot and she had bruises all over her face.  S.L. grabbed the child, and asked Appellant what had happened.  Appellant then made statements to the effect he wanted to harm himself.  Appellant had a knife, and continued making statements he wanted to kill himself.  S.L. texted a friend who was an EMT and worked for the Canton Township Fire Department.  S.L. proceeded to remove the child from the premises until the police arrived.

**{¶4}** Appellant was indicted by the Stark County Grand Jury on two counts of Rape, in violation of R.C. 2907.02(A)(1)(b), and one count of Endangering Children, in violation of R.C. 2919.22(B)(1)(E)(2)(D).

**{¶5}** On January 12, 2015, a jury trial commenced. The jury returned a verdict of guilty to each of the three counts of the indictment.

**{¶6}** On January 20, 2015, the trial court imposed a sentence of life imprisonment without the possibility of parole on both counts of Rape, and eight years on the offense of Endangering Children.  The sentences were ordered to be served consecutively.

**{¶7}** Appellant appeals, assigning as error,

**{¶8}** "I. THE TRIAL COURT DENIED APPELLANT HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, UNDER THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES BY DENYING APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL WHEN THE EVIDENCE WAS INSUFFICIENT TO PROVE 'PENETRATION' AN ESSENTIAL ELEMENT OF THE OFFENSE OF RAPE CHARGED IN COUNT TWO OF THE INDICTMENT.

**{¶9}** "II. THE TRIAL COURT DENIED APPELLANT HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES BY DENYING APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL WHEN THE EVIDENCE WAS INSUFFICIENT TO PROVE THE FELLATIO, AN ESSENTIAL ELEMENT OF THE CRIME OF RAPE AS CHARGED IN COUNT ONE OF THE INDICTMENT.

{¶10} "III. THE TRIAL COURT DENIED APPELLANT'S CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A FAIR TRIAL BY LIMITING COUNSEL'S ARGUMENT TO THE JURY ON REASONABLE DOUBT.

{¶11} "IV. THE TRIAL COURT DENIED APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT TO THE CONSTITUTIONAL [SIC] OF THE UNITED STATES BY DENY [SIC] APPELLANT'S REQUEST FOR A CONTINUANCE OF THE TRIAL."

I.

{¶12} In the first assignment of error, Appellant asserts his conviction for the second count of rape in the indictment is not supported by the sufficiency of the evidence.

{¶13} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, superseded by constitutional amendment on other grounds as stated by *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668. "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenges questions whether the State has met its burden of persuasion." *State v. Thompkins*, supra at 78 Ohio St.3d 390.

{¶14} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492

superseded by State constitutional amendment on other grounds as stated in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

{¶15} Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, supra. This test raises a question of law and does not allow the court to weigh the evidence. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541.

{¶16} In *State v. Thompkins* supra, the Ohio Supreme Court held "[t]o reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." Id. at paragraph three of the syllabus. However, to "reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id. at paragraph four of the syllabus; *State v. Miller* (2002), 96 Ohio St.3d 384, 2002-Ohio-4931 at ¶ 38, 775 N.E.2d 498.

{¶17} An appellate court reviews a denial of a Crim.R. 29 motion for acquittal using the same standard used to review a sufficiency of the evidence claim. See *State v. Carter* (1995), 72 Ohio St.3d 545, 553, 651 N.E.2d 965, 1995-Ohio-104. Thus, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus."

**{¶18}** Appellant was convicted of Rape, in violation of R.C. 2907.02(A)(1)(b), which reads,

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

\*\*\*

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

**{¶19}** R.C. 2907.01 sets forth the following definitions,

(A) "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

(B) "Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

(C) "Sexual activity" means sexual conduct or sexual contact, or both.

{¶20} Dr. Richard Steiner, D.O. of Akron Children's Hospital who treated the child herein, testified at trial,

Q. And what is it?

A. This is a picture that was taken of A.'s bottom, her anogenital area, and what it reveals - - I lost my stylus here.  What it reveals is a [sic] area of laceration in that - - on the perineum, which is the area between the anus and the vulva, the genitals, and it's a laceration of the tissues in that area.

Q. And is that how that injury appeared on February 12th of 2014?

A. Correct.  That was noted in the emergency room at Aultman, and was one of the deciding factors in having her transferred to our facility.

Q. And, again, this may be an obvious question, but would this injury be significantly painful?

A. Oh, yes.  Yeah.  It's a very sensitive area and it's a significant laceration.

Q. What types of things cause this type of injury?

A. These injuries are the result of a force blunt trauma to the - - to that area, to the perineum, to the anogenital region.  That blunt trauma causes a separation, a tearing of the tissues.

Q. Was A. tested for any sexually transmitted diseases?

A. Yes.

Q. And why is that?

A. We have injuries to two areas of the body that are often targeted with sexual activities, sexual acts.  We have the mouth that demonstrates clear penetrating trauma to the oropharynx, to the mouth that is deep into the throat, that was forced.  We also have trauma to the genitalia. That was blunt force trauma to the genitalia.  Those two injuries, as I mentioned, are often seen as a result of sexual activity with young children.  And so it was our suspicion that there may have been - - that these injuries may have been the result of sexual activity, and so sexually transmitted diseases were tested for and treated for.

Q. Thank you.

* * *

Q. Thank you.

And, doctor, again, and still based upon your training and experience and your evaluation of A., to a reasonable degree of medical certainty, are her injuries consistent with a child who has been sexually abused?

A. Yes, her injuries are consistent with sexual abuse.  As I mentioned before, we have injuries to areas of the body that are injured with penetrating trauma to those areas, penetrating trauma to the mouth, and penetrating trauma - - blunt penetrating trauma to the genitalia.  And so these areas - - or the injuries are certainly consistent with sexual abuse.

* * *

Q. And you also said it spared the perianal tissues in the vaginal introitus.  Do you remember using those words?

A. Yes.

Q. Spare means did not affect, right?

A. Pardon me?

Q. Spare means did not affect, did not injure?

A. Right.

Q. And the perianal tissue, that would be - - peri meaning the outside?

A. The surrounding.

Q. The surrounding area. And vaginal introitus means – introitus is the entrance, correct?

A. Correct.

Q. So what that means is that no injuries found to the inside areas of the anal cavity or of the vaginal entrance, correct?

A. Correct.

Q. If I can go a little bit further, you wrote there was no bruising of the labia, clitoris or urethra. Could you tell us what that means please?

A. Well, the labia, the clitoris and the urethra are tissues of the genitalia. The labia are the lips of the genitalia, the external folds. The clitoris and the urethra are structures that are internal between the labia. And then the introitus, the entrance of the vestibule of the vagina.

Q. So, in short, you're describing the vaginal area and saying there was no bruising? Excuse me.

A. Correct.

Q. And then you also wrote, the posterior fourchette and the fossa navicularis was free of lacerations or scars. What do you mean by that?

A. Well, that is - - that is - - those are other structures within the introitus of the genitalia.

Q. The entrance, correct?

A. Correct.

Q. All right. And what that means is now we know there's no bruising, and this sentence means there's no laceration or scars?

A. Correct.

Q. And scars would imply a healed wound of some kind?

A. Correct.

Q. Then you say, the hymen was annular with a smooth margin. What does that mean?

A. That was the - - that's a description of the anatomy of the hymen itself. Annular means that it was completely surrounding the vaginal canal. And smooth - - smooth border, is that what I said?

Q. Smooth margin.

A. Smooth margin would be that it was smooth. I mean the free margin of the hymen was smooth without any irregularities.

Q. So that means there was no bruising, there was no scars, there was no lacerations, and it was smooth.

A. Correct.

Q. And next you said, there were no attenuations bruising or transections.   And you said bruising, but what is attenuations and transections?

A. It means there's no separation or trauma to the hymenal tissue itself.

Q. And then you say there was an ample posterior dimension to the hymen.  What does that mean?

A. The area of the hymen that's most commonly injured with sexual intercourse is the posterior dimension, the posterior region of the hymen, and oftentimes that area is narrowed as a result of trauma, repeated trauma. And in this case it was not, there was an ample dimension.

Q. Which is opposite to the most common finding in cases of sexual entrance, correct?

A. Correct.

Q. And then you said there was no vaginal discharge noted within the introitus.  What do you mean by that?

A. That there was not any discharge or not any fluid coming from the vagina that I could see.

Q. And then you said that the sphincter tone was normal.  What does that mean?

A. That's of the anus.  There's - - the anus was closed, the muscles were sufficiently tightened.

Q. And, finally, you said there was no bleeding from the anal opening. What does that mean?

A. There's no blood coming from the anus.

Q. So, in short, what you found is there was no - - there was absolutely no findings of injury, bruising, or healing of any previous injuries to either the anal area or to the vaginal area of the child.

A. Correct.

* * *

Q. And since there was trauma in other places of the body, why couldn't this just be nonsexual trauma?

A. Because it is in the anogenital region.  It is an area that is - - in order to get to it you have to separate the legs, you have to pull the legs apart, expose the anogenital region so that the traumatic force is focused on that specific area.  There's no other way for that area to be injured.  So it's completely - - it's a - - it's a completely different type of mechanism and exposure to have that area injured.

Q. Now when you say there is no other way to have that area injured, did you mean that?

A. There's no other way for that area to be injured than to have the legs spread apart and the trauma directed to that specific area.

Q. But that does not mean that it cannot be injured in a way which would not include sex; isn't that correct?

A. That area is injured in a straddle injury. When a leg - - when a child is running, straddles something, and their - - of course their legs have to be spread apart, and that area is the target of the trauma.

A. was 11 months old, A. also had no history of any straddle or straddle injury. So eliminating that in the plausibility of her developmental accomplishments, to have a straddle injury, that's the only mechanism that would have caused that injury.

Tr. at 372-397.

{¶21} On redirect, Dr. Steiner opined,

Q. Thank you.

You were also asked about notes in your record that indicated that there were some vaginal or anal tissues that were spared. You were asked questions about the hymen.

The absence of bruising, the absence of injuries to those specific areas, does that change your opinion that A.'s injuries were consistent with sexual abuse?

A. No, that didn't change my opinion. I used that at the time to make my diagnosis that the trauma was to the perineum, was targeting the perianal - - or was targeting the anogenital area. It just happened not to injure the anus or the introitus vaginal area of her genitalia.

Q. So it injured the - - it injured the somewhat larger space between the vagina and the anus?

A. Correct.

Tr. at 421-422.

**{¶22}** Upon review of the evidence presented, we find the evidence insufficient to prove the essential element of penetration.

**{¶23}** Dr. Steiner testifies to a blunt force trauma to the vaginal area, similar to a straddle injury. While the evidence demonstrates injury, including tearing and laceration to the anogenital region, the testimony concludes the same is caused by blunt force trauma. It does not demonstrate penetration, even slight, of the vagina or anus.

**{¶24}** While we recognize the law requires only slight penetration, we find the evidence herein insufficient to demonstrate even slight penetration. However, we find the evidence was sufficient to prove attempted vaginal and/or anal rape. See *State v. Lee*, 10th Dist. Franklin County 03 AP-436, 2004-Ohio-5540, citing *State v. Wells* (2001), 91 Ohio St.3d, 32, 35.

**{¶25}** Appellant's first assignment of error is sustained. We vacate Appellant's conviction on one count of rape and modify the judgment entered by the trial court to reflect a verdict of guilty on the lesser included offense of attempted rape. Because attempted rape is a lesser offense, we remand the matter to the trial court for resentencing on Count Two as attempted rape.

II.

**{¶26}** In the second assignment of error, Appellant maintains his conviction on the first count of Rape [fellatio] is not supported by the sufficiency of the evidence.

**{¶27}** Again, at trial herein Dr. Steiner testified,

When we see that on x-ray, that tells us that there's a wound that allows the communication between the outside air and those tissues. That's the only way air can get in there.

Normally the lining of the esophagus, the airway, and so on, keeps air out and bacteria and everything else - - keeps air and bacteria out of those tissues and so you don't see it. But when there's a connection, a wound, a laceration, air is allowed to get into those spaces and you see it on x-ray.

And so this is a very significant finding on x-ray indicating that there's been a serious injury to the interior part of the body. I mean, this is clear back in the throat. You can hardly reach it with your finger. And to have air in that space is a - - is a big deal. It's not supposed to be there and you got to figure out where it's coming from, why it's there, and then treat the potential side effects of that. And if there's air there, there's bacteria and other garbage that got in there that shouldn't be.

* * *

One of the most common causes of this finding on x-ray, one of the most traumatic events, is a child running around with a pencil in their mouth, they trip, they fall, the pencil then shoves into the back of their throat. That causes the tear that allows the air to come in, and we see this finding in that situation. I've had pencils, pens, had a toothbrush once that was actually - - when I was in the emergency room, actually the child came in with the

toothbrush still in there.  And all of that - - those injuries gave us this kind of finding on x-ray.

It's a serious injury because there's a lot of vital tissues back in there and if that gets infected the infection can spread down into the chest as well as up into the base of the skull.  So this is a big deal when you find it, it's a serious injury.  And it's a result of a penetrating injury into the mouth, into the deep areas of the mouth.

* * *

A. We have injuries to two areas of the body that are often targeted with sexual activities, sexual acts. We have the mouth that demonstrates clear penetrating trauma to the oropharynx, to the mouth that is deep into the throat that was forced.  We also have trauma to the genitalia.  That was blunt force trauma to the genitalia.  Those two injuries, as I mentioned, are often seen as a result of sexual activity with young children.  And so it was our suspicion that there may have been - - that these injuries may have been the result of sexual activity, and so sexually transmitted diseases were tested for and treated for.

Tr. at 368-373.

{¶28} Dr. Steiner also testified to the significant bruising to the child's head and face, and testified the areas were not likely the result of an accident.  Tr. at 358. He testified there was bruising behind the ears, which would not be the result of a defined accident of a child being hung upside down. Tr. at 359-360. He further testified to the injuries being to both sides of the head and to symmetrical locations.  Tr. at 360.

{¶29} Dr. Steiner further testified to the injury around the child's mouth and lips. He testified the abrasions were similar to a rug burn, and were the result of friction, or traumatic rubbing of the surface of the skin, abrading the area, rubbing away the surface of the skin down to the middle layers of the basal layers of the skin itself.  Tr. at 363-364. Specifically, he opined,

Q. And what would cause an injury like this?

A. Well, a - - again, this is rather symmetric, distributed fairly evenly around the entire mouth, and so there would have been something that abraded or penetrated into the mouth against her resistance to keep that object out of her mouth.  It - - oh, you took the picture down.

Q. I'm sorry.

A. I'm sorry.

Q. Sorry about that.

A. So she was resisting something that was entering into her mouth with her lips tight, her mouth tightly closed, but something was being forced into her mouth.

Q. Thank you.

Tr. at 364.

{¶30} Based upon the evidence noted supra, the evidence pertaining to the trauma to A.'s anogenital region noted supra and the entire record regarding Appellant's reactions and statements, we find Appellant's conviction for Rape, Fellatio, in violation of R.C. 2907.02(A)(1)(b) is supported by the sufficiency of the evidence.

{¶31} The second assignment of error is overruled.

III.

**{¶32}** In the third assignment of error, Appellant maintains he was denied the effective assistance of counsel as the trial court limited counsel's argument to the jury on reasonable doubt.

**{¶33}** A claim of ineffective assistance of counsel requires a two-prong analysis. Appellant must demonstrate counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any defense counsel's essential duties, and Appellant must demonstrate he was prejudiced by counsel's ineffectiveness. *Strickland v. Washington*, 466 US 668, 104 S.Ct 2052 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989).

**{¶34}** Upon review of the assigned error, we find Appellant has not demonstrated prejudice. But for the alleged error, the outcome of the trial would not have been otherwise.

**{¶35}** The third assignment of error is overruled.

IV.

**{¶36}** In the fourth assigned error, Appellant asserts he was denied the right to a fair trial by the trial court's denial of his motion for continuance of the trial date.

**{¶37}** Upon review of the procedural history of the case, we find the trial court did not abuse its discretion in denying Appellant's motion to continue the trial date herein.

**{¶38}** Appellant's fourth assignment of error is overruled.

**{¶39}** Accordingly, Appellant's conviction in the Stark County Court of Common Pleas on one count of Rape, in violation of R.C. 2907.02(A)(1)(b) is reversed, and his conviction on one count of Rape, Fellatio, in violation of R.C. 2907.02(A)(1)(b) is affirmed.

The verdict is modified to reflect a verdict of guilty on one count of Attempted Rape, and the matter is remanded for resentencing.

By: Hoffman, P.J.

Wise, J. and

Baldwin, J. concur