[Cite as *State v. Cook*, 2023-Ohio-994.]

COURT OF APPEALS
KNOX COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 22CA00009 |
| | : | |
| ANDREW J. COOK | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Knox County Court of
                             Common Pleas, Case No. 20CRI20308

JUDGMENT:                    AFFIRMED

DATE OF JUDGMENT ENTRY:      March 27, 2023

APPEARANCES:

For Plaintiff-Appellee:                 For Defendant-Appellant:

CHARLES T. MCCONVILLE                   TODD W. BARSTOW
KNOX CO. PROSECUTOR                     261 W. Johnstown Rd., Suite 204
117 E. High St., Suite 234              Columbus, OH 43230
Mount Vernon, OH 43050

*Delaney, J.*

{¶1} A p p e l l a n t Andrew J. Cook appeals from the April 26, 2022 Sentencing Entry of the Knox County Court of Common Pleas.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} This case arose on September 20, 2020, when Jane Doe was drug-dependent and living at appellant's residence with other drug users. Appellant sexually assaulted Jane and she sought treatment at a local hospital, leading to the investigation resulting in this case. The following evidence is adduced from the record of appellant's jury trial.

*Testimony of Jane Doe*

{¶3} Jane was a lifelong victim of sexual abuse first perpetrated by close family members. Jane did not report the abuse to authorities and never received treatment for the sexual-abuse trauma; other family members told her not to say anything "so no one would get in trouble." From an early age, Jane ran away from home and abused drugs and alcohol.  At age 20, she had a child with whom she now has no contact.  Jane has a drug-related felony conviction.

{¶4} Jane experienced periods of sobriety. During one such period, she obtained an apartment and a job. She became friends with Rick Black, who introduced her to appellant. Jane was wary of appellant but described herself as "hung up on" Rick Black, leading to another downward spiral. Black provided Jane with drugs and sometimes a place to live, "without expecting anything in return." Jane relapsed into addiction, lost her job and apartment, and lived intermittently with Black in a tent in the woods in Knox County.

{¶5} At some point, Black died from a drug overdose and Jane remained in the throes of addiction, homeless and "couch-surfing." She sometimes stayed at appellant's home, aware that appellant wanted to be "boyfriend and girlfriend." Jane testified bluntly that she did not want a "kissy-style" relationship with appellant, but he forced himself on her several times and she understood that if she wanted a place to stay, she would "have to put up with it."[1]

{¶6} Jane testified appellant repeatedly told her he wanted to be "boyfriend and girlfriend" but she did not want that type of relationship. She did have a sexual relationship with appellant while she lived at his residence; she testified sex with appellant was an obligation and at first, she "wasn't OK with it" but as time went on she "really wasn't OK with it." T. I., 188. Eventually she told appellant she didn't want to have sex with him anymore and he said OK. T. I., 188.

{¶7} On September 19, 2020, Jane returned to appellant's residence after a few weeks away and appellant offered to celebrate her birthday. Two other people lived at the residence as well: Mary Roe and her boyfriend, Brandon. Mary and Brandon were also drug dependent, and Mary gave appellant drugs in exchange for a place to stay.

{¶8} The group of four celebrated Jane's birthday with a meal and a cake. Mary gave Jane a gift including a coloring book and markers. Jane was in her bedroom coloring when appellant came in and said "he was going to take a shower and then jump on her."

---

[1] We note motions for competency evaluations were filed for both appellant and Jane Doe. Appellant was found to be competent to stand trial, but the record does not contain the outcome of Jane's evaluation, if any. Jane's testimony includes markedly immature language unusual for a 30-year-old adult, and the detective noted that when he interviewed Jane, he warned her she "would have to answer embarrassing questions" and "use big-people words." T. 153. The question of any intellectual deficiency apart from drug dependency is not otherwise developed in the record.

Jane testified she did not respond, but she did not want to have sex with appellant. She was suffering from a urinary tract infection (UTI) at the time and did not want to have intercourse. Appellant knew Jane had a UTI because she needed a ride to Urgent Care for treatment and he paid for her antibiotics.

{¶9} Jane testified appellant "proceeded to have sex with her" while she lay in the bed. She told him she was in pain from the UTI. T. I, 192-193. Jane did not push appellant off or yell for help. Appellant left the room and Jane remained in the bed, "wanting to die."

{¶10} The next day, appellant wanted Jane to kiss him and she refused, so he told her to get out. Jane had nowhere to go and no one to call. She ended up calling M.J., someone she worked with several years ago whom she considered a friend. M.J. picked her up, along with her belongings, and they drove around for several hours, talking. M.J. told Jane that she should either go to the police or the hospital and report the sexual assault; Jane chose to go to the hospital.

{¶11} Jane testified she told nurses at the hospital what happened and they performed a rape kit. Social workers and nurses encouraged Jane to go to "OHP" and she did so for 10 days.[2] She "detoxed" at OHP, where she was diagnosed with post-traumatic stress disorder. Jane testified that OHP also addressed her feelings of wanting to harm herself. Upon release from OHP, Jane was able to check in to a shelter and obtain resources.

---

[2] The trial court clarified that "OHP" is "Ohio Health Partners," a behavioral-health inpatient program.

{¶12} Jane testified unequivocally that she did not want to have sex with appellant after the birthday party and did not give him permission to have sex with her; she told him she did not want to have sex because of the UTI. After the rape, she had nowhere to turn and was scared. She sought medical attention at the hospital and the hospital contacted the police. Jane repeatedly stressed she did not "rat out" appellant, but the rape happened, she needed treatment, and the investigation ensued. T. 204-206.

*Mary Roe is present for birthday party and aftermath*

{¶13} Mary Roe is an admitted drug addict and dealer who was living in appellant's residence with her boyfriend, Brandon, around the same time as Jane Doe. Mary admittedly gave appellant drugs in exchange for a place to live. At trial, Mary was in sober living after a stint in a CBCF.

{¶14} Mary testified she was desperate for a place to live after she overdosed at her own apartment and was kicked out. Appellant offered her a place to stay; she was aware of appellant's "underlying motives" in offering drug-dependent females a place to stay, but she had a boyfriend and she provided appellant with drugs, not sex. Mary and Brandon lived with appellant in August and September of 2020, during the time Jane stayed there. Mary liked Jane and was sympathetic to her situation; she testified that appellant used Jane for sex and it was evident to everyone that Jane did not want to have sex with appellant but did so for a place to live. Jane often slept in Mary and Brandon's bed to avoid appellant, who would kick her out when she didn't comply.

{¶15} Mary testified that in September, appellant said they would have a birthday party for Jane; Mary bought her markers and a coloring book. The group ate dinner and

had a cake; throughout the party, appellant commented that he wanted to have sex with Jane but Jane said she didn't want to because she had a painful UTI.

{¶16} Eventually Mary and Brandon went into their own bedroom and appellant went into Jane's bedroom. Mary testified that he came out after about 90 minutes, wearing only sweatpants and "covered in sweat," repeating "I just broke that girl, I just broke that girl, I just busted her wide open." T. 215-216. Mary testified appellant was "proud" of hurting Jane and "bragged about it for days." Mary went into Jane's bedroom and found her crying, in pain, saying she wanted to die. Jane told Mary appellant put lotion on her vagina and had sex with her against her will. Mary helped Jane pack her belongings and saw her leave.

{¶17} She didn't see Jane again until, coincidentally, Mary was at the police department after a raid and Detective Dechant was interviewing Jane Doe about the rape. Dechant asked Mary if she knew anything about Jane's rape and Mary provided a written statement. When asked why she didn't report the rape or personally get help for Jane, Mary testified that she doesn't report her own rapes and it's not up to her to report someone else's.

*M.J. takes Jane Doe to the hospital*

{¶18} M.J. was Jane's coworker several years ago when she was sober and functional. He knew her to be a good mother and coworker, but had not spoken to her in several years. Their relationship in 2020 consisted of occasional Facebook messages.

{¶19} On September 20, 2020, M.J. was surprised when his wife received a phone call from Jane Doe, asking if M.J. could pick her up right away because she needed help. M.J. drove to the address and found Jane sitting outside with her belongings in a laundry

basket. M.J. picked Jane up and took her to get something to eat. He testified he was "shocked" at the state he found her in, as though she was "an entirely different person" from the one he knew. M.J. drove Jane around for hours trying to figure out what happened and where she could go. He understood she had nowhere to live and was forced to have sex with someone against her will. M.J. encouraged Jane to either go to the police or the hospital, and she finally consented to go to the hospital.

{¶20} M.J. brought Jane to the hospital and waited while she was checked in. He left his phone number with nurses because he had Jane's belongings, which he returned several days later when Jane was able to go to a shelter.

*SANE exam, rape kit, and DNA match*

{¶21} Jane was examined by two SANE nurses at the hospital, one supervisor and one trainee, and both testified at trial. The nurses described Jane as distraught and hopeless, even potentially suicidal. Jane told the nurses her history of sexual abuse, homelessness, and drug addiction. Jane told them she was required to have sex with appellant for a place to stay. A physical examination of Jane revealed an injury to her vagina which was photographed. Evidence was collected in a rape kit.

{¶22} After the SANE exam, Jane was transferred to a psychiatric facility (OHP). Initially Jane was scared and did not want to report the rape to law enforcement. After she detoxed and was treated at the psychiatric facility, however, she gave the nurses permission to contact law enforcement. Upon cross-examination, the nurses testified it is not their role to challenge a victim's story; they take the victims at their word and write down the history as provided by the patient.

{¶23} Personnel from the Ohio BCI crime lab testified that the sample from Jane's rape kit was positive for semen. Lab testing determined there were two DNA contributors in Jane's sample: Jane and appellant.

{¶24} Detective Dechant testified his investigation began when he learned of the rape kit at Knox Community Hospital. He spoke with the SANE nurse supervisor and learned Jane Doe was in mental health treatment. He eventually contacted Jane at a shelter and interviewed her with the aid of a social worker. Jane told him the circumstances of the rape, UTI, and hospital visit. Dechant also learned from Mary Roe that appellant boasted about hurting Jane after he assaulted her.

{¶25} Dechant interviewed appellant and the interview was played at trial. Appellant at first denied knowing who Jane was and asked to see a picture of her.

{¶26} After his interview of appellant, Dechant sought a warrant for his arrest for rape. Appellant was charged by indictment with one count of rape pursuant to R.C. 2907.02(A)(2), a felony of the first degree, and entered a plea of not guilty.

{¶27} On January 5, 2021, the trial court ordered appellant to undergo forensic evaluation to determine his competency to stand trial. Following a hearing on February 4, 2021, appellant was found competent to stand trial.

{¶28} The matter proceeded to trial by jury and appellant was found guilty as charged. The trial court ordered a pre-sentence investigation (P.S.I.) and continued the matter for sentencing.

{¶29} Appellant appeared before the trial court on April 21, 2022 and was sentenced to an indefinite prison term of 8 to 12 years.

{¶30} Appellant now appeals from the April 26, 2022 Sentencing Entry of the Knox County Court of Common Pleas.

{¶31} Appellant raises two assignments of error:

**ASSIGNMENTS OF ERROR**

{¶32} "I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF RAPE AS THAT VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶33} "II. THE TRIAL COURT SENTENCED APPELLANT TO INDEFINITE TERMS OF INCARCERATION PURSUANT TO A STATUTORY SCHEME THAT VIOLATES APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS."

**ANALYSIS**

I.

{¶34} In his first assignment of error, appellant argues his rape conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. We disagree.

{¶35} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins,* 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks,* 61 Ohio

St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶36} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra,* 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶37} Sufficiency of the evidence is a legal question dealing with whether the state met its burden of production at trial. *State v. Murphy*, 5th Dist. Stark No. 2015CA00024, 2015-Ohio-5108, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Murphy* at ¶ 15. The test for sufficiency of

the evidence raises a question of law and does not permit the court to weigh the evidence. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Murphy* at ¶ 15, citing *Thompkins* at 386.

{¶38} Appellant was found guilty upon one count of rape pursuant to R.C. 2907.02(A)(2), which states, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" means vaginal intercourse between a male and female and "insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal * * * opening of another." R.C. 2907.01(A). "Force" means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. R.C. 2901.01(A)(1).

{¶39} Appellant first contends that appellee relied upon sympathy for Jane Doe. The jurors were instructed that they must not be influenced by any consideration of sympathy or prejudice. T. 376. The jury is presumed to follow the instructions of the trial court. *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), paragraph four of the syllabus. Appellant has not pointed to any evidence in the record that the jury failed to do so in this case. Moreover, we note appellee argued Jane Doe was an "imperfect victim," admitting her drug dependence and criminal history. Jane herself was frank about her transactional relationship with appellant. We find no evidence in the record that appellee attempted to unduly garner sympathy for the witness.

{¶40} Appellant further argues Jane was an unreliable witness, noting she did not tell him no or "demonstrate any physical signs that [his] desires were unwanted," Brief, 2. In other words, Jane did not resist appellant. A victim need not prove physical resistance to the offender in a prosecution for rape. R.C. 2907.02(C).

{¶41} Appellant does not challenge appellee's evidence on any specific element of the offense; instead, his arguments are premised upon the Jane's credibility. We note that Jane's testimony was corroborated by the testimony of Mary Roe, M.J., the SANE nurses, and the physical evidence. Moreover, we have held that the testimony of one witness, if believed by the factfinder, is enough to support a conviction. See, *State v. Dunn*, 5th Dist. Stark No. 2008-CA-00137, 2009-Ohio-1688, ¶ 133. The weight to be given the evidence introduced at trial and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. Thomas*, 70 Ohio St.2d 79, 434 N.E.2d 1356 (1982), syllabus. It is not the function of an appellate court to substitute its judgment for that of the factfinder. *State v. Jenks*, 61 Ohio St.3d 259, 279, 574 N.E.2d 492 (1991). Any inconsistencies in the witnesses' accounts were for the trial court to resolve. *State v. Dotson*, 5th Dist. Stark No. 2016CA00199, 2017-Ohio-5565, ¶ 49.

{¶42} We further note appellant's assertions that the sexual intercourse was consensual and Jane only went to police because he kicked her out are belied by the evidence. Mary Roe testified appellant boasted about hurting Jane after the assault and the SANE exam found evidence of vaginal injury. Jane did not go to the police to seek retaliation for appellant kicking her out; despite M.J. encouraging her to go to the police, Jane went to the hospital instead.

{¶43} Viewing the evidence and inferences reasonably drawn therefrom in the light most favorable to appellee, we conclude any rational trier of fact could have found all of the essential elements of rape beyond a reasonable doubt. The record is devoid of any evidence the jury lost its way in resolving conflicts in the evidence and appellee's evidence supports the guilty verdict of the trial court.

{¶44} Appellant's first assignment of error is overruled.

II.

{¶45} In his second assignment of error, appellant argues his indefinite sentence violates his right to due process. We disagree.

{¶46} We first note that pursuant to *State v. Maddox*, 168 Ohio St.3d 292, 2022-Ohio-764, 198 N.E.3d 797, the Ohio Supreme Court held that constitutional challenges to the Reagan Tokes Act are ripe for review on direct appeal. *State v. Turner*, 5th Dist. Licking No. 2022 CA 00040, 2023-Ohio-441, 2023 WL 2017516, ¶ 40.

{¶47} In *State v. Householder*, 5th Dist. Muskingum No. CT2021-0026, 2022-Ohio-1542, 2022 WL 1439978, this Court set forth its position on the arguments raised in appellant's second assignment of error:

> For the reasons stated in the dissenting opinion of The Honorable W. Scott Gwin in *State v. Wolfe*, 5th Dist. Licking No. 2020CA00021, 2020-Ohio-5501 [2020 WL 7054428], we find the Reagan Tokes Law does not violate Appellant's constitutional rights to trial by jury and due process of law, and does not violate the constitutional requirement of separation of powers. We hereby adopt the dissenting opinion in *Wolfe* as the opinion of this Court. In so

holding, we also note the sentencing law has been found constitutional by the Second, Third, Sixth, and Twelfth Districts, and also by the Eighth District sitting en banc. *See, e.g., State v. Ferguson*, 2nd Dist. Montgomery No. 28644, 2020-Ohio-4153 [2020 WL 4919694]; *State v. Hacker*, 3rd Dist. Logan, 2020-Ohio-5048 [161 N.E.3d 112]; *State v. Maddox*, 6th Dist. Lucas, 2022-Ohio-1350 [188 N.E.3d 682]; *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837 [2020 WL 4279793]; *State v. Delvallie*, 8th Dist. Cuyahoga, 2022-Ohio-470 [185 N.E.3d 536]. Further, we reject Appellant's claim the Reagan Tokes Act violates equal protection for the reasons stated in *State v. Hodgkin*, 12th Dist. Warren No. CA2020-08-048, 2021-Ohio-1353 [2021 WL 1530036].

{¶48} Based on the forgoing authority, the trial court did not err in sentencing appellant to an indefinite non-life term. *Turner*, supra, 2023-Ohio-441, ¶ 42; *State v. Corbett*, 5th Dist. Licking No. 22CA0013, 2023-Ohio-556, --N.E.3d--, ¶ 45.

{¶49} Appellant's second assignment of error is overruled.

**CONCLUSION**

{¶50} Appellant's two assignments of error are overruled and the judgment of the Knox County Court of Common Pleas is affirmed.


By:  Delaney, J.,

Gwin, P.J. and

Hoffman, J., concur.